*261 Opinión disidente de la
Jueza Asociada Señora Fiol Matta.
Una mayoría de este Tribunal ha acogido la recomendación de la Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces y Juezas del Tribunal de Primera Instancia y del Tribunal de Apelaciones (la Comisión) y ha resuelto destituir al Hon. José A. Ruiz Rivera de su puesto de Juez Superior. Creo que la prueba presentada en este caso no satisface el estándar de prueba clara y convincente establecido por las reglas de procedimiento aplicables y por nuestra jurisprudencia. Por esa razón, disiento.
I
La opinión per curiam resume adecuadamente los eventos procesales que llevaron a la eventual presentación de la querella en la que se imputó al juez Ruiz Rivera unos car-gos por violación a los Cánones I, XI, XXIV y XXI de Etica Judicial, 4 L.P.R.A. Ap. IV-A. Sin embargo, no analiza las evidentes contradicciones en la prueba recibida durante la vista evidenciaría, que apuntan a la mendacidad del testigo estrella de este procedimiento. Un estudio cuidadoso del informe y de las declaraciones juradas sometidos por la Oficina de Administración de los Tribunales (OAT), el informe de la Comisión, la transcripción de los procedimientos ante la Comisión, la prueba documental sometida y la demás evidencia e información existente en el expediente, confirma que ese testimonio no era confiable al grado que exige un procedimiento de esta naturaleza.
Admite la opinión mayoritaria que la prueba de cargo descansó esencialmente en el testimonio de Frankie Pietri Sepúlveda, un narcotraficante convicto, quien era conocido como tal aun antes de su convicción en el ambiente en el cual se desenvolvía el juez Ruiz Rivera. Según la mayoría, *262 el historial delictivo del testigo, “si bien debe considerarse al evaluar sus declaraciones, no es determinante per se. De igual modo, el hecho de que se trate de un único testimonio no conduce necesariamente a la conclusión de que debe descartarse. Supone ponderar otros factores que permitan determinar su confiabilidad”. Opinión per curiam, pág. 254. El problema estriba, precisamente, en que esos “otros factores” no permiten adjudicarle al testimonio del señor Pietri la confiabilidad necesaria para, sobre su única base, destituir a un miembro de la Judicatura. Me explico.
II
José A. Ruiz Rivera fue nombrado Juez Municipal el 25 de enero de 1990 y Juez Superior el 8 de noviembre de 1999. Antes de esta última designación, fue evaluado por la OAT el 11 de junio de 1999. En dicha ocasión fue descrito como un juez “muy bien cualificado”.
El 30 de mayo de 1996 y el 14 de octubre de 1996, el juez Ruiz Rivera presidió dos vistas preliminares contra el Sr. Frankie Pietri Sepúlveda y la esposa de éste. Las imputaciones se relacionaban con la Ley de Sustancias Controladas, la Ley de Armas de Puerto Rico y el Código Penal de Puerto Rico. En la vista de 14 de octubre de 1996 el juez Ruiz Rivera determinó causa probable contra Pietri, pero archivó la acusación contra su esposa. No se solicitó una vista preliminar en alzada contra la esposa de Pietri.
El juez Ruiz Rivera y Pietri son, precisamente, los principales testigos ante la Comisión. Según sus respectivos testimonios, los hechos pertinentes a esta controversia ocurrieron entre 1996 y 1997. En lo demás, según veremos, sus testimonios divergen sustancialmente. Cabe señalar que además del testimonio del juez Ruiz Rivera, la parte querellada presentó otros testigos a los que nos referiremos según sea necesario.
*263 1. Versión del juez Ruiz Rivera
El juez Ruiz Rivera acostumbraba visitar el “Hollywood’s Café and Pub” (el Pub), localizado en el pueblo de Ponce donde él residía. En algunas ocasiones asistía solo y en otras en compañía de su esposa. La Sra. Limarys Pacheco, dueña del Pub durante el periodo de 1994 a 1998, era amiga del juez Ruiz Rivera. Ambos fueron vecinos en el pasado. La Sra. Limarys Pacheco testificó que “en ocasiones sí le guardábamos estacionamiento [al juez Ruiz Rivera] y él se estacionaba en el área del frente del negocio”.(1) La señora Pacheco también declaró que en el local tenían seguridad privada y que en el estacionamiento “el área del frente [era] muy alumbrado, teníamos unos focos sumamente grandes que [sic] era muy claro el lugar y siempre se mantenía un guardia de seguridad en el área del frente y uno en el área de atrás”.(2) Según la dueña, las personas que frecuentaban el lugar eran lo que “nosotros llamamos el joven adulto, el profesional .. .”.(3)
Una noche el juez Ruiz Rivera acudió al Pub junto a su esposa y, en un aparte, fue a saludar a Octavio González. Octavio trabajaba en un banco hipotecario y era amigo del juez Ruiz Rivera. Octavio estaba hablando con Pietri. El juez se acercó y Octavio, como acepta Pietri en su testimonio, le presentó a Pietri como estudiante de medicina.(4) Según el juez Ruiz Rivera, “hablé par de palabras pues lo que uno puede hablar usual con una persona que la acaban de presentar y me voy para mi mesa con mi esposa”.(5)
Según relató el juez Ruiz Rivera, el segundo encuentro con Pietri fue en la casa del juez. En una ocasión en que el juez Ruiz Rivera estaba lavando el carro en la marquesina *264 de su casa, Pietri se apareció vestido de una manera que “dictaba [sic] mucho del estudiante de medicina que me habían presentado”. El juez Ruiz Rivera continuó declarando:
[Elntonces él me dice en ese momento que tiene, que estaba dando una vuelta porque él tenía una amistad en la urbanización y que estaba visitándolo.... Y ya yo estaba un poquito molesto porque si yo vivo en un sitio de acceso ... en un lugar de acceso controlado, para aquel tiempo y ahora, es precisamente para eso, a m[í] me gusta el que llega a casa yo sepa quién va a llegar a casa ... me dice pues que llegó preguntando, que llegó preguntando y entonces me dice que él tiene un problema y que quiere a ver, a ver si yo lo puedo orientar sobre el problema que él tiene. Entonces me dice que su abogado es el Ledo. Francisco León Sánchez y que él tiene un caso en el quinto piso del Tribunal, ya ahí la cosa entonces se vuelve un poquito más, más extraña para mí porque era de conocimiento público ... casi el 100 por ciento de sus clientes [del Ledo. León Sánchez] eran narcotraficantes .... Ahí pues ya yo molesto le digo, mire los Jueces no podemos estar dando orientación a nadie, o sea, los Jueces estamos impedidos, yo no debería estar hablando con usted en este momento. Yo lo que le recomiendo es que se vaya a donde su abogado y que su abogado lo oriente ....(6)
Cabe señalar que el juez Ruiz Rivera declaró que en la urbanización en que residía tenía como vecinos a un fiscal y a un compañero juez de la sala de lo criminal.
Posterior a este encuentro, el juez Ruiz Rivera se comunicó con su amigo Octavio para contarle sobre lo sucedido e indagar sobre Pietri. Octavio le dijo que conoció a Pietri a través de Serafín Rosado. El juez Ruiz Rivera se comunicó con Serafín Rosado, a quien conocía desde joven de la urbanización Las Delicias. Éste le dijo que sabía que Pietri andaba “en malos pasos de droga”.(7) El testimonio del Sr. Serafín Rosado, agente de seguros para la época, confirmó lo declarado por el juez Ruiz Rivera. Testificó el señor Rosado que conocía a Pietri de toda la vida. Declaró haberse *265 encontrado con Pietri en el Pub. Durante el encuentro, Pietri le dijo que estaba estudiando medicina. Rosado confirmó que él se lo presentó a Octavio esa misma noche en el Pub y que el juez Ruiz Rivera lo llamó en una ocasión para preguntarle sobre Pietri.
Resulta pertinente aclarar que el juez Ruiz Rivera declaró que cuando le presentaron a Pietri en el Pub no recordaba que habIa presidido una vista preliminar contra Pietri y su esposa. Segiin el juez Ruiz Rivera "eso no es nada que, el que está en Sala de lo Criminal sabe que eso no es nada extraño, o sea, yo veIa una Sala de Vistas Preliminares que tenIa 30 6 40 Vistas Preliminares al dIa "(8)
Como tercer encuentro, el juez Ruiz Rivera declaró sobre el día que vio a Pietri en La Bodeguita del Medio, en Ponce (La Bodeguita). Pietri entró al establecimiento poco después de que el señor Pellitzia, dueño de La Bodeguita, le había servido el almuerzo al juez Ruiz Rivera. Relató el juez Ruiz Rivera lo siguiente:
Yo ya sabiendo lo que me había dicho Serafín, habiéndome él hecho lo que me hizo de llegar a casa, me levanto molesto y voy donde Pellitzia y le digo, “mira cóbrame que me voy” y me dice, “Juez qué le pasa usted no ha empezado a comer”, y le digo “porque ahí llegó una persona que me hizo un pocoverguenza [sic] y yo no me voy a quedar aquí” ... me fui y no volví a saber de ... Pietri hasta el día que lo vi aquí. O sea, lo próximo que supe de Pietri fue todo este, esto que me ha imputado aquí.(9)
El señor Pellitzia testificó que la clientela de La Bodeguita era “altamente profesional, doctores, ... abogados, licenciados, jueces, ... Fiscales que iban del Tribunal, que estaba muy cerca, y profesionales del área que se reunían allí a almorzar”.(10) Tanto el señor Pellitzia como el abo *266 gado Juan E. Medina Quintana, quien se encontraba ese día en La Bodeguita, confirmaron la versión del juez Ruiz Rivera.(11)
2. Versión del Sr. Frankie Pietri Sepulveda
Al momento de la vista ante la Comisión, Pietri se encontraba confinado en una cárcel federal. Para la época de los hechos (1996-1997) era narcotraficante, es decir, se dedicaba a la venta de drogas y controlaba varios puntos en residenciales del pueblo de Ponce. Testificó haber conocido a Octavio a través de un amigo de infancia que vivía en Las Delicias. Octavio trabajaba para un banco hipotecario y, según Pietri, lo estaba ayudando a conseguir un préstamo hipotecario para comprar una casa.(12)
Vio por primera vez al juez Ruiz Rivera en el tribunal de Ponce. El juez presidía una vista preliminar en la que encontró causa para acusar contra Pietri, pero no contra su esposa. No se celebró una vista en alzada contra su esposa. Luego de este suceso, Pietri conoció propiamente al juez Ruiz Rivera una noche en Hollywood’s Café. Testificó Pietri que acudió al Pub para reunirse con Octavio y discutir los trámites del préstamo. Esa noche, Octavio le presentó al juez Ruiz Rivera. Estuvieron entre media y una hora en el Pub bebiendo y luego se dirigieron al estacionamiento. Se montaron en el carro de Octavio y se dieron “pases” de cocaína mientras el carro estaba estacionado. El juez Ruiz Rivera se sorprendió cuando vio a Octavio darse un “pase” frente a Pietri, pero Octavio le dijo: “no el muchacho es cool, el muchacho es chévere, tú sabes no hay problema.” Luego se marcharon en el auto de Octavio a dar vueltas por Ponce “como uno dice mareándose, estar dándose el pasecito tranquilo, se siente uno más, más tranquilo no *267 hay tanta gente”.(13) Regresaron al estacionamiento del Pub y cada uno se fue en su carro. Según Pietri, en esa ocasión no se habló nada sobre la determinación de causa en su contra por parte del juez Ruiz Rivera e “incluso para mi pensar [dice Pietri] yo era una persona común para él tú sabes”.(14) Sin embargo, como veremos más adelante, Pietri testificó que el día en que fueron juntos a “Coaches”, en el trayecto de San Juan a Ponce, el juez Ruiz Rivera le dijo que lo había reconocido desde el primer día.
El testimonio de Pietri sobre lo sucedido en el Pub también contradice lo que había informado en su deposición ante la OAT. En su deposición, Pietri indicó haber visto a Octavio darse un “pase” en el Pub, no así al juez Ruiz Rivera. Específicamente, declaró que “Octavio se lo dio, pero yo no vi a Puruco [el juez Ruiz Rivera] que se dio el pase en el Pub”.(15)
El segundo encuentro con el juez Ruiz Rivera, según Pietri, fue en La Bodeguita. “Yo lo vi y me le acerqué y lo saludé y ahí fue que me dijo, ‘mira vamos a reunirnos más a menudo vamos’ y yo, ‘sí sí vamos a reunirnos’ y él me dio los números de teléfono de la casa, del celular y el de la oficina y todo eso y planificamos ... [l]os apunté en una libretita que yo tenía”.(16)
La libreta de teléfonos de Pietri fue sometida en evidencia como Exhibit 4 de la parte querellante. Según el expediente, de los números allí apuntados bajo el nombre de “Puruco”, que era el apodo del juez,(17) el único que efecti *268 vamente era de éste era el de la oficina. Este era el número de la secretaria del juez Ruiz Rivera.(18) A requerimientos de la Comisión.(19) se sometió en evidencia la Certificación del Sr. Carlos R. Torres Acevedo, investigador del Departamento de Servicios de Seguridad de la Puerto Rico Telephone Company (.Exhibit 7 de la parte querellada). Mediante este documento se certificó que el número que Pietri identificó como el de la casa del juez Ruiz Rivera corresponde al número telefónico del banco hipotecario para el cual trabajaba Octavio Rodríguez. Por otro lado, durante el periodo para el cual la Telefónica emitió su certificación (desde el 5 de agosto de 1997 hasta el 20 de noviembre de 2003) el alegado número de celular del juez no corresponde con su nombre ni con el de su esposa.(20)
Al examinar la libreta de teléfonos de Pietri se observa que los tres números están en las páginas correspondientes a las letras “Q, R”. Justo al lado aparece escrito el nombre “Puruco” y “José” entre paréntesis. Se percibe claramente que ambos nombres y los números que, según el testimonio de Pietri, corresponden al de la casa y al celular *269 del juez están escritos en una misma tinta, mientras que el número de la oficina aparece en tinta diferente. Ello parece indicar que fueron copiados en momentos distintos, contrario a lo testificado.
En cuanto al tercer encuentro, según Pietri, éste surgió por invitación suya al juez Ruiz Rivera. Durante el directo, Pietri testificó que llamó por teléfono al juez Ruiz Rivera para dar una vuelta. Al ser contrainterrogado por el licenciado Ortiz Alvarez, abogado del juez Ruiz Rivera, Pietri declaró creer haber llamado al juez Ruiz Rivera a su casa y no a su oficina; señaló: “[c]reo que lo llamé al de la casa, creo, que llamé a la casa ... [e]l que tengo en mi libreta ...” (Énfasis suplido.) Pietri testificó, en el interrogatorio directo, que junto al juez Ruiz Rivera, Octavio y los hermanos Rodney y Jessie Ortiz, decidieron ir hacia San Juan a un lugar llamado “Coaches”. Pietri y el juez Ruiz Rivera se fueron juntos en el carro del juez Ruiz Rivera. Los demás se fueron en el carro de Octavio. Durante el camino hacia San Juan, Pietri y el juez Ruiz Rivera se dieron “pases” de cocaína. A pesar de que Pietri testificó que él no era usuario de drogas, “pa’ que él se sintiera confiado pues olíamos juntos, olía yo con él [refiriéndose al juez Ruiz Rivera]”.(21)
Al llegar a “Coaches”, el juez Ruiz Rivera se sintió incómodo porque, según Pietri, “ ‘Coaches’ esta [sic] lleno de gente de clase, del ambiente de él[,] abogados, fiscales, alguaciles, agentefs] federales ... pensaba que lo estaban viendo o algo así ...”.(22) Ante la incomodidad del juez Ruiz Rivera, ambos se marcharon de “Coaches”. De regreso a Ponce, según el testimonio de Pietri, el juez Ruiz Rivera le dijo: “mira yo sabía quién eras tú lo que pasa es que yo no quise decirte nada, yo saqué absuelta a tu esposa porque yo sabía que tu esposa no tenía nada que ver en el caso, *270 tuve que encontrarte causa a ti porque había demasiado de prueba en contra tuya ...”.(23)
El próximo encuentro, según el testimonio de Pietri, fue en la casa del juez Ruiz Rivera. Pietri le llevó cocaína a la casa y el juez Ruiz Rivera lo invitó a que se quedara para una barbacoa que tenía con la familia.(24) Pietri rechazó la invitación del juez Ruiz Rivera porque no se sentía cómodo compartiendo en la casa de éste y con su familia. Pietri le entregó la droga y se marchó. Ante la Comisión, Pietri testificó que sabía donde residía el juez Ruiz Rivera “[p]orque ya yo frecuentaba ahí, porque ahí yo tenía un amigo mío y ya sabía más o menos dónde era la residencia. Le pregunte [sic] a los muchachos dónde es, ‘mira el señor Ruiz vive al final’y yo llegué”.(25) Sin embargo, en su declaración jurada ante la O AT, Pietri declaró que el juez Ruiz Rivera le había dado la dirección cuando lo llamó para que le llevara cocaína a su casa y para invitarlo junto a su esposa a una “barbacoa” familiar. Según Pietri “[é]l me había dicho, cuando había hablado conmigo, me dijo que ... sabe, la dirección verbalmente, cómo era”.(26)
Este fue el último encuentro entre Pietri y el juez Ruiz Rivera. Posteriormente, Pietri fue encarcelado en la prisión federal.(27)
III
En el caso de autos, la Comisión llegó a sus propias determinaciones de hechos, basándose “exclusivamente en la evidencia presentada y admitida” (énfasis suplido), se *271 gún requiere la Regla 33 de Procedimiento para Acciones Disciplinarias y de Separación del Servicio por Razón de Salud de Jueces o Juezas del Tribunal de Primera Instancia y del Tribunal del Circuito de Apelaciones de Puerto Rico (Reglas para Acciones Disciplinarias), 4 L.P.R.A. Ap. XV-A.(28) En varias de estas determinaciones de hechos la Comisión señaló no haberle otorgado credibilidad al testimonio del querellado, “ni a aquellos que intentaron corroborarlo”. A raíz de ello, la Comisión encontró probados los cargos imputados y recomendó la destitución del juez Ruiz Rivera. Por las razones que explico a continuación, entiendo que la Comisión erró al encontrar probados el primer y el tercer cargo según imputados.
Las Reglas de Evidencia aplicables a casos civiles rigen en los procedimientos ante la Comisión de manera supletoria. 4 L.P.R.A. Ap. XV-A, R. 30. Aplicando las nor-mas que se desprenden de la Regla 10 de Evidencia, 32 L.P.R.A. Ap. IV, sobre evaluación y suficiencia de la prueba, podemos decir que la evaluación de la prueba es un ejercicio cualitativo que implica “aquilatar el testimonio, para lo cual, por supuesto, hay que considerar la impugnación que sufrió el testigo, si alguna, la naturaleza creíble o inverosímil del testimonio y su comportamiento al testificar (demeanor)”. E.L. Chiesa Aponte, Tratado de derecho probatorio: Reglas de Evidencia de Puerto Rico y federales, Santo Domingo, Publicaciones JTS, 1998, T. II, págs. *272 1231-1232. Sobre la credibilidad e impugnación de testigos, la Regla 44(B)(1) de Evidencia señala que la credibilidad de un testigo puede ser impugnada o sostenida mediante el “Comportamiento del testigo mientras declara y la forma en que lo hace”. 32 L.RR.A. Ap. IV. En otras ocasiones hemos expresado que la observación en este contexto es “ ‘el instrumento más útil para la investigación de la verdad’ ” (Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975)), mientras que en otras ocasiones hemos comentado que “es altamente improbable estudiar a través de una observación tan rápida, en circunstancias tan poco deseables como la que brinda un juicio sobre los hechos, la conducta moral de un testigo”. Sanabria v. Sucn. González, 82 D.P.R. 885, 993 (1961). El “demeanor”, por lo tanto, es una pieza importante al evaluar la credibilidad de un testimonio. Sin embargo, no lo es todo al momento de hacer una determinación judicial.
Como bien señala la opinión mayoritaria, el quántum necesario para probar los cargos imputados en estos procesos disciplinarios es el de prueba “clara, robusta y convincente”. Véase 4 L.P.R.A. Ap. XV-B, R. 25. Según el comentario a la Regla 25 de Disciplina Judicial: “El mismo precisa de un grado mayor que el requerido para casos civiles (preponderancia de la prueba) y menor al requerido en casos criminales para probar culpabilidad (más allá de duda razonable)” (Enfasis suplido.) Reglas de Procedimiento para Acciones Disciplinarias y de Separación del Servicio por Razón de Salud de Jueces del Tribunal de Primera Instancia y del Tribunal de Apelaciones de Puerto Rico, Tribunal Supremo de Puerto Rico, 25 de septiembre de 1992, pág. 40. Véase, además, P.P.D. v. Admor. Gen. de Elecciones, 111 D.P.R. 199 (1981).
La función de “ ‘un criterio de prueba, en cuanto dicho concepto tiene cabida en la Cláusula del Debido Proceso y en la función de determinar los hechos, es la de “instruir al juzgador sobre el grado de confianza que nuestra sociedad *273 entiende que él debe tener en la corrección de sus conclusiones sobre los hechos para un tipo particular de adjudicación”. El criterio sirve para ubicar el riesgo de error entre los litigantes y para indicar la relativa importancia que la decisión final debe tener’ (Cita omitida.) P.P.D. v. Admor. Gen. de Elecciones, supra, pág. 223, citando a Addington v. Texas, 441 U.S. 418, 423 (1979). Por lo tanto, un estándar de prueba instruye al juzgador sobre el grado de efecto persuasivo que debe ofrecerle la evidencia recibida. El criterio de evidencia clara y convincente, específicamente, exige una alta probabilidad de la ocurrencia del hecho. 2 McCormick on Evidence Secs. 339-340, págs. 421-428 (1999); P.P.D. v. Admor. Gen. de Elecciones, supra.
Ante la Comisión, la parte querellante presentó los testimonios de Frankie Pietri Sepúlveda, Ledo. Radamés Vega Rodríguez(29) y el alguacil Leonardo Rosado Vega. El *274 testimonio de Frankie Pietri Sepúlveda es la única prueba que de ser creída sostiene los cargos imputados. Por el contrario, la parte querellada presentó los testimonios de Limarys Pacheco Vélez, Sgto. Hilario Marrero Rivera, agente José A. Campos Camacho, Sr. Ángel Pellitzia, Sr. Octavio González Rodríguez, Sr. Serafín Rosado González, Ledo. Octavio Capó Pérez, Ledo. Juan E. Medina Quintana, Dr. Carlos Carro Pagán, Dr. Arnaldo Cruz Igartúa, Dr. Edgar Domenech Facundo, Sr. Roberto Rentas Ramos, Sr. Wilson Almodovar y el testimonio del propio querellado Hon. José A. Ruiz Rivera.
Sabemos que la evaluación de la prueba testifical “no es ejercicio cuantitativo —contar testigos o versiones de testigos— sino cualitativo, esto es, aquilatar el testimonio”. Chiesa Aponte, op. cit., pág. 1231. “Además, un abogado, por ser abogado, no tiene que merecerle a un tribunal más crédito que el que pueda merecerle cualquier ciudadano.” Ortiz v. Cruz Pabón, supra, pág. 946. Sin embargo, no podemos pasar por alto que las imputaciones del caso de autos se sostienen únicamente por el testimonio de un narcotraficante a quien el juez querellado le determinó causa para acusar en vista preliminar. Tampoco podemos pasar por alto los elementos contradictorios del testimonio del señor Pietri Sepúlveda.
En respuesta a las declaraciones de Pietri, la parte querellada presentó el testimonio del juez Ruiz Rivera. La versión del juez Ruiz Rivera es diametralmente opuesta a la del señor Pietri y, a diferencia de la versión de Pietri, gran parte de ésta fue corroborada por las declaraciones de otros testigos. Lo ocurrido en el primer encuentro (en Hollywood’s Café), según relatado por el juez Ruiz Rivera, coincide con las declaraciones de Serafín Rosado y Octavio González Rodríguez. La dueña del Pub declaró sobre la iluminación en el estacionamiento del negocio y sobre la *275 presencia de guardias de seguridad privada. En cuanto al encuentro entre el juez Ruiz Rivera y Pietri en La Bodeguita, el relato del juez coincide con lo declarado por el dueño del negocio, Ángel Pellitzia, y por el Ledo. Juan E. Medina, quien alegadamente se encontraba en el lugar al momento de los hechos.
Sobre el alegado encuentro para ir a “Coaches”, que según el juez Ruiz Rivera nunca ocurrió, Pietri testificó que el juez se sentía incómodo porque “ ‘Coaches’ esta [sic] lleno de gente de clase, del ambiente de él[,] abogados, fiscales, alguaciles, agente[s] federales ... pensaba que lo estaban viendo o algo así ...”. Esta aseveración resulta contradictoria y difícil de creer si la evaluamos a la luz de los otros incidentes alegadamente ocurridos. No es creíble que al juez Ruiz Rivera le incomodara compartir en un ambiente nocturno en San Juan, donde un juez del área de Ponce fácilmente podría pasar desapercibido y donde con gran probabilidad no se conociera a Pietri, mas, sin embargo, compartiera tranquilamente en negocios de Ponce concurridos por colegas del área, a plena luz del día —como en La Bodeguita— y a tempranas horas de la noche —como en Hollywood’s Café— en compañía de alguien conocido por muchos como un narcotraficante. Al respecto, el sargento Hilario Marrero, testigo de la parte querellada, quien trabaja desde hace aproximadamente 20 años en la División de Drogas y Narcóticos de la Policía de Puerto Rico en Ponce, declaró que sabía quién era Frankie Pietri porque “era un individuo de bajo mundo ... una de las personas más importantes en el tráfico de drogas en el área sur, que pertenecía a una ganga de las más poderosas que ha pasado en el área sur en unos años atrás”.(30)
No debemos olvidar que, según el testimonio de Pietri, el juez Ruiz Rivera lo reconoció desde el principio. Por lo tanto, si creemos dicho testimonio, debemos concluir que *276 durante todos los encuentros relatados por Pietri el juez sabía que la persona con la que estaba socializando públicamente era un narcotraficante reconocido a quien él mismo le había determinado causa en vista preliminar. (31)
Con relación al encuentro en la casa del juez Ruiz Rivera, la versión de Pietri resulta aún más difícil de creer. Según Pietri, el juez Ruiz Rivera lo invitó a su casa para que le llevara cocaína y de una vez se quedara para una barbacoa junto a su familia. La prueba demostró que el juez Ruiz Rivera vivía en una urbanización con acceso controlado y que varios compañeros abogados e incluso jueces eran sus vecinos. Como sabemos, “[l]os jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería”. Pueblo v. Luciano Arroyo, 83 D.P.R. 573, 582 (1961).
Por otro lado, la parte querellada presentó el testimonio de tres peritos médicos. Estos fueron: el Dr. Carlos José Carro Pagán, el Dr. Arnaldo Cruz Igartúa y el Dr. Edgard Domenech Pabón. El doctor Carro Pagán, cardiólogo, declaró que atiende al juez Ruiz Rivera desde el 1990 porque “padecía de una serie de pulsos lentos”(32) y que no existe ningún indicio de que éste consuma cocaína u otra sustancia controlada. El doctor Domenech Pabón, otorrinolaringólogo, cirujano bucal y jefe del Departamento de Otorrinolaringología en el Hospital San Lucas, “hizo una evaluación completa, no solamente eh, a nivel de examen físico, sino también del historial ... ambas de ellas salieron completamente negativas”. No procede descartar del todo este testimonio, si bien la evaluación del doctor Domenech fue el 25 de octubre del 2002 y, según su testimonio, la *277 existencia de rastros por el uso de cocaína en el 1996 depende de la cantidad y frecuencia del uso de esta sustancia.
Por su parte, el doctor Cruz Igartúa, psiquiatra especializado en psiquiatría de las adicciones, testificó que el 25 de junio de 2003 comenzó un proceso para evaluar al juez Ruiz Rivera. El doctor Cruz Igartúa condujo entrevistas con el juez Ruiz Rivera y su esposa, y llevó a cabo una serie de pruebas psicológicas, psiquiátricas y toxicológicas, entre otras. En resumen, declaró:
Yo lo que puedo decirle de toda esta evaluación es que en el momento presente no hay indicador alguno que el señor Ruiz Rivera tenga problema alguno de uso de sustancia alguna, incluyendo legales, sustancias legales como alcohol. Eso es lo que yo puedo declarar y que, y que eso hace bien, hace improbable, vamos a ponerlo así, que lo haya tenido anteriormente .... (Enfasis suplido.)(33)
Por último tenemos que hacer referencia a la falta de correspondencia entre los números telefónicos del juez Ruiz Rivera y los que Pietri tenía en su libreta de teléfonos y que alegadamente eran del juez, pero según la prueba no lo eran, a excepción del de su oficina, que podía obtenerse fácilmente de la guía telefónica.(34) La prueba documental no corroboró estas alegaciones de Pietri; más bien levantó serias dudas al respecto, dudas que se extienden entonces a su versión del encuentro en La Bodeguita, donde alegadamente obtuvo la información.
La Regla 35 para Acciones Disciplinarias dispone, en lo pertinente:
(b) Si el tribunal determina que los cargos en que está fundamentada la querella, o parte de ellos, han sido probados y ello acredita conducta que amerite acción disciplinaria, procederá a imponer al juez o a la jueza, conforme a la naturaleza *278 de éstos, la correspondiente sanción o medida remediativa. Esta podrá ser la recomendada por la Comisión u otra que el tribunal determine.
(d) Si, por el contrario, el tribunal considera que los cargos de la querella o las alegaciones de la petición de separación no han sido acreditados, adoptará la recomendación de la Comisión si ésta fuera desestimación y archivo, y si no, lo ordenará así motu proprio. 4 L.P.R.A. Ap. XV-A.
Esta disposición nos permite extender a las acciones disciplinarias contra jueces las mismas expresiones que hemos adoptado para las determinaciones de comisionados especiales en los casos de disciplina profesional contra abogados y notarios. En dichos casos hemos explicado que
... cuando una querella se ventila ante un Comisionado Especial, aunque nuestra tendencia general es a no alterar las determinaciones de hechos que éste emita, este Tribunal no está obligado a aceptar sus recomendaciones. Al evaluar la adopción de los hallazgos del Comisionado Especial, consideramos esencialmente si dichas determinaciones están sostenidas por la prueba testifical y documental. Conforme a dicha evaluación, podemos adoptarlas, modificarlas e incluso rechazarlas, aun en ausencia de pasión, prejuicio, parcialidad o error manifiesto. (Citas omitidas y énfasis suplido.) In re Deynes Soto, 164 D.P.R. 327 (2005).
En el caso de autos, la versión de Frankie Pietri Sepúlveda no es persuasiva y la prueba cuidadosamente examinada no es convincente. El testimonio de Pietri contiene muchas e importantes contradicciones y entiendo que, como única prueba para sostener tan delicadas imputaciones, ésta no provee el grado de confianza requerido por el estándar de “prueba clara y convincente”. Después de todo, un buen “demeanor” al testificar, no puede hacer creíble lo increíble. No es altamente probable que los hechos hayan ocurrido según relatados por el señor Pietri. No podemos perder de vista que la destitución de un juez destruye su reputación como ser humano y ésta es difícil de recobrar. Resolvería que la Comisión erró en la apreciación de la *279 prueba y, por consiguiente, ordenaría la desestimación y el archivo del primer y tercer cargo.
VI
Examinemos ahora el segundo cargo imputado al juez Ruiz Rivera. La Comisión le imputó la violación a las nor-mas establecidas en la Resolución del Tribunal Supremo del 25 de febrero de 1982(35) y el Memorando Núm. 62 de 15 de marzo de 1982 preparado por la OAT. Estas directrices impiden a los jueces intervenir con su firma y sello en los negocios jurídicos de naturaleza privada, “a no ser que se trat[e] de aquellos que vayan a surtir efecto en un procedimiento judicial”.(36)
En el caso de autos, el juez Ruiz Rivera hizo una declaración de autenticidad juramentada ante el Hon. Wilfredo Santos López, Juez del Tribunal de Primera Instancia del Distrito Judicial de Ponce (Exhibit 3 de la parte querellante). Aunque en el mismo documento afirma hacerlo “en desempeño de la función de Juez de la SubSección de Distrito del Tribunal de Primera Instancia”, su contenido se refiere al conocimiento que tiene de una persona (Sr. Orlando González) dedicada al oficio de “hojalatería” y su relación “estrictamente” profesional con ésta. Negó, a su vez, haber expedido una orden de allanamiento o un registro dirigido al lugar donde ubica el taller de hojalatería perteneciente al Sr. Orlando González.
El juez Ruiz Rivera alegó que decidió hacer esta declaración de autenticidad debido a unos comentarios que habían llegado a su conocimiento y que, a su juicio, ponían en entredicho su integridad como juez. Según los comentarios, un funcionario no acudió al juez Ruiz Rivera para solicitar la expedición de una orden de allanamiento contra el taller *280 del señor González porque sabía que el juez tenía su carro en reparación en dicho taller. El juez Ruiz Rivera también alegó que hizo la declaración ante el juez Wilfredo Santos López porque se sentía “incómodo” haciéndola frente a un abogado privado.
La declaración fue enviada a la Jueza Administradora de la Región Judicial de Ponce el mismo día que fue otorgada, es decir, el 17 de diciembre de 1997, aunque aparece erróneamente identificada como suscrita el 24 de diciembre de 1997. La declaración de autenticidad enviada a la Jueza Administradora fue acompañada de una carta con membrete oficial del Tribunal General de Justicia. En esta carta el juez Ruiz Rivera expresó su deseo de “despejar cualquier duda que pueda existir sobre su integridad moral, profesional y personal...”. Debemos señalar que al pie de la página tercera de la declaración de autenticidad aparece una anotación de la Hon. Elba Rosa Rodríguez, Jueza Administradora de la Región Judicial de Ponce, donde indica lo siguiente: “¿Quién es este notario. ¿Por qué sello del Tribunal? ¿Con qué propósito hizo esta declaración ... no surge otra inf ....[sic] ¿Se puede localizar la dirección de Orlando González para citarlo ...”.
La prohibición a los jueces de utilizar su firma y sello en negocios jurídicos de naturaleza privada responde al Canon IX de Etica Judicial, que prohíbe a los jueces el ejercicio de la abogacía “que incluye la notaría”. 4 L.P.R.A. Ap. IV-A. Esta prohibición no se extiende a las funciones de autenticación y autorización de documentos que surten efecto én los procedimientos judiciales. Éstos tienen carácter público y, por consiguiente, son permitidas por el Canon X(37) y por la prohibición análoga contenida en la Ley de 12 de marzo de 1908, según enmendada, 4 L.P.R.A. see. 890. Véanse, además: Hernández v. Rosado et al., 22 D.P.R. 387 (1915); López v. Meléndez, 22 D.P.R. 156 (1915). La autoridad que para tomar declaraciones juradas o affidávits con *281 fiere la referida ley a los jueces es una facultad consustancial al descargo de la función judicial, que debe ser utilizada únicamente en aquellas ocasiones en que el afíidávit o la declaración de autenticidad va a surtir efecto en un procedimiento o acción ante cualquier tribunal de justicia. Resolución del Tribunal Supremo de 25 de febrero de 1982.
Conforme a la normativa vigente, este Tribunal dictó una resolución el 25 de febrero de 1982, regulando el alcance de la facultad de los jueces para autorizar declaraciones de autenticidad. En lo concerniente, esta resolución dispone:
Ciertamente, la autenticación de firmas en contratos y solicitudes de licencias de diversos tipos, y las declaraciones juradas de interés privado, caen fuera del marco de autorización de la Ley de 12 de marzo de 1908 y, por consiguiente, no pueden ser hechas por los jueces del Tribunal General de Justicia. Tales declaraciones o afidávits [sic], aun cuando sean para utilizarse ante otras agencias del gobierno, no son incidentales al descargo de la función judicial ni al trámite de acciones o procedimientos ante los tribunales.
En consecuencia resolvemos que ningún juez del Estado Libre Asociado de Puerto Rico puede autorizar afidávits [sic] o declaraciones de autenticidad que involucren un mero interés privado o particular —área que está reservada para los notarios— a no ser que se trate de las declaraciones que vayan a surtir efecto en un procedimiento judicial.
El Memorando Núm. 62 de 15 de marzo de 1982 simplemente comunica a los jueces y secretarios de los tribunales lo emitido por el Tribunal Supremo en la resolución del 25 de febrero de 1982.
Violar esta normativa implica actuar en contravención al Canon XXVI de Ética Judicial, que advierte:
Los anteriores Cánones de Ética Judicial son normas mínimas de comportamiento que todo Juez y toda Jueza debe observar fielmente, tanto en su letra como en su espíritu, por ser consustanciales con el cargo judicial. Estos cánones no excluyen otras normas de conducta que también obligan al Juez y a la *282 Jueza, que están establecidas por ley o que son inherentes al honor tradicional de la judicatura. 4 L.P.R.A. Ap. IV-A.
Este Canon XXVI hace aplicable a los jueces “cualesquiera otras normas de conducta que en alguna forma salvaguarden la dignidad del cargo y la independencia judicial”. R.J. Torres Torres, Cánones de Etica Judicial de Puerto Rico, 9 (Núms.l—4) Forum 27 (octubre 1993).
Resulta forzoso concluir que el juez José A. Ruiz Rivera actuó en contravención a la reglamentación vigente, al gestionar que otro juez emitiera la declaración de autenticidad señalada. Dicha conducta, a su vez, constituyó una violación al Canon XXVI de Etica Judicial, supra. Coincido con la Comisión en cuanto a esta determinación.
La violación de las normas administrativas que reglamentan la actividad de los jueces y las juezas puede conllevar también violaciones a los Cánones de Etica Judicial. In re Hon. Ferrán Quintana, 157 D.P.R. 622 (2002). Las normas disciplinarias deben ser interpretadas de forma estricta y, por la naturaleza de su ministerio, los miembros de la Judicatura deben imponerse “restricciones en cuanto a su conducta que podrían verse extremadamente pesadas por cualquier ciudadano común”. Torres Torres, supra, pág. 7.
El juez Ruiz Rivera no autorizó la declaración de autenticidad aquí cuestionada, sin embargo, ocupando el cargo de Juez, le solicitó a otro juez que la autorizara, para su beneficio personal. La prohibición contenida en la normativa antes discutida, por sus propios términos, está dirigida al juez que autoriza la declaración de autenticidad. Es evidente, sin embargo, que se extiende también al juez que acude a otro magistrado para que le tome juramento o le autorice la declaración de autenticidad.
El juez Ruiz Rivera argumentó que no se trataba de una declaración de autenticidad que perseguía un mero interés particular o privado, pues su comparecencia se debió únicamente a su interés por aclarar y evitar empañar unos *283 procesos judiciales. Estas alegaciones son incorrectas. Una lectura integral del documento en controversia, así como de la carta que lo acompaña, refleja que el verdadero propósito de la declaración fue proteger el interés privado del querellado. Al tener como objetivo salvaguardar la “integridad moral, profesional y personal” del querellado, la declaración se alejó del interés público que tutela la norma en controversia.
Por tal razón, se probó lo imputado en el segundo cargo. Resolvería, sin embargo, que la falta cometida no requiere sanción adicional, pues al habérsele relevado de sus funciones desde el 2002, el juez Ruiz Rivera ha satisfecho la penalidad que hubiéramos impuesto en otras circunstancias.
Por los fundamentos antes expuestos, ordenaría la reinstalación del Hon. José A. Ruiz Rivera a sus labores como Juez Superior del Tribunal de Primera Instancia.

 Transcripción de los procedimientos, vista de 8 de diciembre de 2003, pág. 214.

 íd., pág. 211.

 íd., pág. 209.

 Transcripción de los procedimientos, vista de 4 de diciembre de 2003, pág. 74.

 Transcripción de los procedimientos, vista de 18 de diciembre de 2003, pág. 333.

 íd., págs. 334-336.

 íd., pág. 338.

 íd., pág. 339.

 íd., págs. 342-343.

 Transcripción de los procedimientos, vista de 8 de diciembre de 2003, pág. 50.

 íd., págs. 52-55.

 Transcripción de los procedimientos, vista de 4 de diciembre de 2003, pág. 24.

íd., pág. 35.

 íd., pág. 38.

 Declaración Jurada ante la OAT, 8 de febrero de 2002, pág. 16.

 Transcripción de los procedimientos, vista de 4 de diciembre de 2003, pág. 37. '

 Respecto al nombre de “Puruco”, Pietri declaró: "... después de un tiempo que estuvimos en comunicación, establecimos una amistad, entre comillas, eh, me dijo mira no me llames señor Ruiz llámame ‘puruco’ que los amigos, que yo considero mis amigos me dicen ‘puruco’.” Transcripción de los procedimientos, vista de 4 de diciembre de 2003, pág. 30. Sin embargo, el juez Ruiz Rivera declaró no saber cómo Pietri sabe de su apodo porque: “En mi pueblo las personas de mi familia principal *268 mente me dicen ‘púnico’. Mi esposa que lleva conmigo 17 años me dice José. A mí me dicen ‘puruco’ personas de Adjuntas de cuando yo era joven allá en Adjuntas me dicen ‘puruco’...” Transcripción de los procedimientos, vista de 18 de diciembre de 2003, pág. 356.

 El Exhibit 1 es una certificación de la Sra. Blanca E. Medina Bermúdez, Directora Ejecutiva Regional para el Tribunal General de Justicia, Región Judicial de Ponce, de 22 de julio de 2002. Esta certificación expone lo siguiente:
“Certifico que conforme a los récords existentes en la Oficina Administrativa el Hon. José A. Ruiz Rivera estuvo asignado a la Oficina 401 de este Centro Judicial como Juez de Distrito durante el período comprendido del 12 de septiembre de 1995 hasta el 20 de agosto de 1997. Esta información se desprende de lo siguiente: El teléfono 841-4380 pertenece a la oficina 401. Mediante carta de fecha 12 de septiembre de 1995 se asignó a la Sra. Carmen N. Criado Criado como encargada del mismo. La señora Criado Criado fue asignada secretaria particular del Juez Ruiz Rivera desde el 1ro. de octubre de 1992 hasta el presente. El 20 de agosto de 1997 se asignó a cargo del teléfono 841-4380 a la Sra. Carmen Torres Negrón.”

 Orden de 4 de diciembre de 2003.

 gn ia certificación de la Puerto Rico Telephone Compañy se hizo constar que “[n]o existe información adicional en nuestro sistema con relación a dichos números de teléfonos para el período del 1 de enero de 1989 al 4 de agosto de 1997, ni del 21 de noviembre de 2003 al 4 de diciembre de 2003”. Certificación de la Puerto Rico Telephone Company expedida el 5 de diciembre de 2003.

 Transcripción de los procedimientos, vista de 4 de diciembre de 2003, pág. 50.

 íd., pág. 45.

 íd, pág. 47.

 íd, pág. 96.

 íd, pág. 52.

 Declaración jurada de Frankie Pietri Sepúlveda ante la OAT, pág. 30.

 Según el testimonio de Pietri, éste fue sentenciado a nivel federal a cumplir 19 años de cárcel. Sin embargo, por su cooperación con las autoridades federales, su sentencia fue reducida a 10 años de prisión. Transcripción de los procedimientos, vista de 4 de diciembre de 2003, págs. 58-59.

 Las Reglas de Procedimiento para Acciones Disciplinarias y de Separación por Razón de Salud de Jueces o Juezas del Tribunal de Primera Instancia y del Tribunal de Apelaciones de Puerto Rico quedaron derogadas al aprobarse mediante resolución de este Tribunal las Reglas de Disciplina Judicial, efectivas a partir del 1 de abril de 2005. Debemos señalar que la Regla 35 de Disciplina Judicial (cláusula transitoria) dispone:
“(a) Todo caso que esté bajo investigación en la Oficina de Asuntos Legales al momento de entrar en vigor estas reglas, continuará con el procedimiento vigente a la fecha de la presentación de la queja y hasta la presentación del informe de investigación a la Comisión. Para las demás etapas del caso, regirá el procedimiento disciplinario establecido en estas Reglas.
“(b) Los casos sometidos al Tribunal, en o antes de la vigencia de estas Reglas, continuarán con el procedimiento que regía a la fecha de la presentación de la querella o petición de retiro involuntario.” (Énfasis suplido.) In re Aprobación Reglas, 164 D.P.R. 137, 164-165 (2005).

 Según Pietri, la primera persona a quien le contó su versión sobre el juez Ruiz Rivera fue al fiscal Radamés Vega Rodríguez. Transcripción de los procedimientos, vista de 4 de diciembre de 2003, págs. 55-56. Según Vega Rodríguez, Pietri le contó sobre este particular cuando el fiscal fue a la cárcel federal a entrevistarlo por “un caso de asesinato que ocurrió en el Residencial Lirios del Sur”. íd., pág. 163. En el contrainterrogatorio se dijo:
“Ledo. Fernández Nadal: “Y lo cierto y verdadero es que como cuestión de hechos en ese caso en específico el Confinado Pietri interesaba algún beneficio por esa participación, ¿eso es correcto?’
“Vega Rodríguez: ‘Bueno, en ese momento no se estaba hablando de eso en particular, obviamente el proceso es ... entrevistar al confinado y entonces el trato se da obviamente dependiendo de lo que él pueda producir no’.
“Ledo. Fernández Nadal: ‘Exacto, que mientras más información él produzca mejor puede ser el trato o el acuerdo que Fiscalía le de [sic] a ese confinado, ¿eso es correcto?’.
“Vega Rodríguez: ‘No necesariamente’.
“Ledo. Fernández Nadal: ‘No’.
"Vega Rodríguez: ‘No necesariamente. Este puede haber una inmunidad total, puede haber una inmunidad parcial, todo depende, verdad, de lo que se acuerde entre el confinado y su abogado y la Fiscalía’.
“Ledo. Fernández Nadal: “Y puede haber un archivo de caso también’.
“Vega Rodríguez: “Puede haberlo sí’.
“Ledo. Fernández Nadal: ‘Eso es parte de’.
“Vega Rodríguez: “Podría haberlo’.
“Ledo. Fernández Nadal: “Y en este caso específicamente se llevó a un acuerdo con el confinado Pietri, eh, un convenio’.
“Vega Rodríguez: “Eh, yo ... si mi memoria no me falla creo que sí’.
*274 “Ledo. Fernández Nadal: ‘Hubo un convenio’.
“Vega Rodríguez: ‘Hubo un convenio’.” íd., págs. 163-165.

 Transcripción de los procedimientos, vista de 8 de diciembre de 2003, pág. 21.

 Según citado anteriormente, Pietri testificó que el juez Ruiz Rivera expresó durante el camino de San Juan a Ponce lo siguiente:
“[M]ira yo sabía quién eras tú lo que pasa es que yo no quise decirte nada, yo saqué absuelta a tu esposa porque yo sabía que tu esposa no tenía nada que ver en el caso, tuve que encontrarte causa a ti porque había demasiado de prueba en contra tuya ...”

 Transcripción de los procedimientos, vista de 18 de diciembre de 2003, pág. 181.

 íd., pág. 264.

 Transcripción de los procedimientos, vista de 4 de diciembre de 2003, pág. 132.

 Resolución sobre el alcance de la facultad de los jueces para autorizar affidavit o declaraciones de autenticidad.

 Resolución del Tribunal Supremo de 25 de febrero de 1982, pág. 3.

 4 L.P.R.A. Ap. IV-A.